In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 21-2914

USA GYMNASTICS,

*Plaintiff-Appellee,*

*v.*

LIBERTY INSURANCE UNDERWRITERS, INC.,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:18-cv-01306-RLY-MPB — **Richard L. Young**, *Judge.*

---

ARGUED MAY 17, 2022 — DECIDED AUGUST 16, 2022

---

Before SYKES, *Chief Judge*, and HAMILTON and BRENNAN, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Larry Nassar, who was affiliated with nonprofit USA Gymnastics, Inc. ("USAG"), sexually assaulted hundreds of female athletes. After Nassar's conduct came to light, USAG faced many lawsuits and multiple investigations. USAG and its insurers, including Liberty Insurance Underwriters, Inc., litigated questions about insurance coverage in an adversary proceeding before a bankruptcy court. In

a previous appeal, among other rulings, we affirmed the decision that Liberty had a duty to defend USAG.

There were also ancillary disputes over the amount of attorneys' fees that Liberty owed USAG. While the first appeal remained pending, USAG sought to enforce the order entitling it to reimbursement. Liberty resisted, asserting that large portions of the fees USAG claimed were not reasonable and necessary. After a bench trial, the bankruptcy court recommended that the district court award USAG nearly all the requested fees. The district court agreed, so it adopted most of the bankruptcy court's findings and conclusions and entered judgment for USAG. Liberty appeals.

The bankruptcy and district courts correctly concluded that USAG was entitled to a presumption that the fees it incurred were reasonable and necessary. Liberty must therefore rebut the presumption by showing that various portions of the fees did not meet that standard. Because Liberty fails to do so, we affirm.

**I**

Our opinion resolving the previous appeal recounts the underlying facts in detail. *USA Gymnastics v. Liberty Ins. Underwriters, Inc.*, 27 F.4th 499, 508 (7th Cir. 2022). In short, Nassar used his position with USAG to sexually assault hundreds of women and girls over several decades. Because of that abuse, USAG has faced hundreds of lawsuits by former athletes, as well as several investigations by federal and state entities, including Congress, the Indiana Attorney General, and the United States Olympic & Paralympic Committee ("USOPC"). *Id*. at 509.

USAG sued several insurers in Indiana state court, arguing the companies were required to defend it and pay legal expenses related to the lawsuits and investigations. *Id*. One of those insurers was Liberty, from which USAG had purchased a claims-made directors and officers liability insurance policy. The insurers removed the case to the United States District Court for the Southern District of Indiana under diversity jurisdiction. USAG filed for bankruptcy under Chapter 11, and the insurance-coverage litigation between USAG and Liberty took place in an adversary proceeding as part of that bankruptcy. *Id*. The district court retained jurisdiction.

Faced with cross-motions for summary judgment, the bankruptcy court concluded that Liberty's policy covered the "athlete lawsuits" and various investigations. *Id*. at 509–10. Liberty filed objections to the bankruptcy court's findings and conclusions, but the district court overruled those objections. In January 2020, the district court ordered Liberty to "provide a complete defense" to USAG with respect to several matters, including the athlete lawsuits and several investigations. The district court also ordered Liberty to reimburse USAG for its defense costs, but the court did not award damages in any specific amount. Liberty appealed the district court's order.

In February 2022, we held that Liberty had a duty to defend USAG against nearly all the athlete lawsuits. *See id*. at 525, 528, 530–31. We also ruled that the Congressional, USOPC, and state-level investigations were "formal proceedings" or "formal investigations" for which coverage exists under the insurance policy. *Id*. at 531–33. We remanded, though, for further factfinding on the question of whether the policy's "Third Party EPL" sublimit restricted the scope of coverage.

*Id*. at 533–34. Liberty's petition for rehearing was denied, and our mandate in that appeal issued in April 2022.

While the first appeal was pending, the parties continued to dispute and litigate issues concerning payment. Shortly after the district court ordered Liberty to provide coverage and reimburse USAG for its defense costs, USAG sent Liberty a calculation of damages. USAG sought about $3.18 million in past defense costs, including $1.77 million for investigations and $205,000 in prejudgment interest on past defense costs. Liberty did not agree to USAG's demand and sought to stay the district court's defense order. In turn, USAG moved to enforce the order. After the district court denied Liberty's motion to stay, USAG sent Liberty another letter, demanding that the insurer identify the specific amounts of attorneys' fees that it disputed. Consistent with the defense order, USAG also insisted that Liberty "enclose a check payable to USAG for the entire amount [Liberty] agrees is reasonable and necessary on the Covered Matters." Liberty declined.

The bankruptcy court held a bench trial on USAG's motion to enforce the defense order. Stipulated exhibits and deposition testimony were entered into the record. USAG's Chief Legal Officer, C.J. Schneider, testified about his role within the organization and his efforts to retain and oversee the efforts of six law firms, which performed various types of legal work for USAG. In addition, USAG offered the expert testimony of attorney Gene Schoon, who had prior experience serving as a national coordinating counsel during his days as a practicing lawyer. He testified that in his opinion, all the fees USAG sought were reasonable and necessary.

On the other hand, Liberty presented the expert testimony of attorney Brand Cooper. Cooper testified that because of

several issues with the invoices submitted by the retained law firms, he could not conclude that the attorneys' fees USAG sought were reasonable and necessary. When the court asked whether he had an opinion on what the bottom-line number of reasonable and necessary fees for one of the law firms should have been, Cooper responded he had "no problem with the billings that they provided, with the exceptions that [he] noted." Later, the court requested "a joint statement about identifying costs that are not disputed." The court noted the fees that both sides agreed were reasonable and necessary appeared to be "the lion's share" of those that USAG claimed.

At that point, Cooper testified that he determined certain fee amounts incurred by USAG—which totaled about $1.43 million—were reasonable and necessary. Yet almost immediately, Cooper contradicted his prior testimony. On redirect- and recross-examination, Cooper stated his general objections to the law firms' invoices prevented him from determining that any amounts were reasonable and necessary. Then, in answer to the court's questions, Cooper expanded on the nature of his objections but refused to give concrete figures that were not disputed.

Shortly after the bench trial concluded, USAG sent Liberty a third demand letter. USAG noted that Cooper's testimony suggested large portions of the fees were reasonable and necessary. In its written response, Liberty claimed that Cooper "could not make any final assessment of the amount of reasonable and necessary defense costs," and Liberty further asserted that his testimony did not bind it.

In September 2020, the bankruptcy court entered proposed findings and conclusions. The court rejected Liberty's

arguments and concluded that under applicable case law, USAG was entitled to a presumption that the fees incurred were reasonable and necessary. The court also found Schoon "to be the more credible and reliable expert witness." According to the bankruptcy court, USAG had proved by a preponderance of the evidence that $1,944,354.26 of the fees it incurred were reasonable and necessary. So, the court recommended that the district court enter judgment in that amount, plus prejudgment interest. Liberty filed objections to the bankruptcy court's proposed findings and conclusions.

The district court overruled those objections and declared its intent to enter judgment for USAG in the amount of $1,889,278.26 ($1,944,354.26 minus $55,076.00 in legal research costs that the district court concluded were not recoverable), plus prejudgment interest. Liberty requested that the court enter final judgment under Federal Rule of Civil Procedure 54(b) on the part of USAG's case seeking reimbursement of past attorneys' fees. The court agreed and entered final judgment for USAG in the amount of $2,171,951.18, plus prejudgment interest. Liberty appealed from that judgment. Simultaneously, Liberty moved to approve a supersedeas bond and stay execution on the judgment. The court granted the motion and stayed execution on the judgment pending our mandate in this appeal.

Long after briefing concluded, and just days before oral argument, the parties notified this court that Liberty had paid USAG $1,655,680.19 toward the judgment. According to the parties, Liberty is without recourse to seek return of that payment. As the parties agree, that renders moot any remaining dispute about the amounts that Cooper testified were reasonable and necessary, as we cannot grant "any effectual relief"

in that respect. *See Germeraad v. Powers*, 826 F.3d 962, 967 (7th Cir. 2016) (citations omitted). The live controversy before us concerns the remaining $458,472.26 of the judgment.

## II

We first address the parties' arguments about a presumption, under which the attorneys' fees that a policyholder claims after an insurer has breached its duty to defend the policyholder are assumed to be reasonable and necessary. Then, we consider whether Liberty has identified any special circumstances that preclude the presumption's application. Finally, we review Liberty's challenges to the trial courts' factual findings.

Liberty contends the bankruptcy and district courts improperly applied the law when they concluded that the fees USAG incurred were reasonable and necessary. We review the assessment of attorneys' fees "under a highly deferential abuse of discretion standard." *Vega v. Chi. Park Dist.*, 12 F.4th 696, 702 (7th Cir. 2021) (citation omitted). To the extent that Liberty contends the bankruptcy and district courts applied the wrong legal framework, though, our review is de novo. *Id*. (citing *Nichols v. Ill. Dep't of Transp.*, 4 F.4th 437, 441 (7th Cir. 2021)).

In *Taco Bell Corp. v. Continental Casualty Co.*, this court considered a scenario in which an insurer had breached its duty to defend but later argued the policyholder had incurred excessive fees. 388 F.3d 1069, 1075–76 (7th Cir. 2004). Under those circumstances, the court held, the policyholder "had an incentive to minimize its legal expenses" such that there was "no occasion for a painstaking judicial review." *Id*. at 1076.

The Indiana Court of Appeals, faced with the same scenario, adopted *Taco Bell*'s holding. *Thomson Inc. v. Ins. Co. of N. Am.*, 11 N.E.3d 982, 1023–24, 1031 (Ind. Ct. App. 2014). In *Thomson*, the court ruled that when an insurer has breached the duty to defend and the policyholder "has secured, supervised and paid for a defense without any expectation of payment, those costs are market tested and are presumed to be reasonable and necessary." *Id.* at 1023–24 (internal quotation marks omitted). Along with *Taco Bell*, the court in *Thomson* also relied on *Metavante Corp. v. Emigrant Savings Bank*, where this court rejected the need to conduct a line-by-line analysis of the attorneys' fees claimed by a prevailing party—provided that those fees were market tested. 619 F.3d 748, 772–76 (7th Cir. 2010); *Thomson*, 11 N.E.3d at 1024.

This case comes to us through diversity jurisdiction, so we apply state substantive law and federal procedural law. *Hahn v. Walsh*, 762 F.3d 617, 629 (7th Cir. 2014). Our task is to determine how the state's highest court would rule. *Smith v. RecordQuest, LLC*, 989 F.3d 513, 517 (7th Cir. 2021). If the state's highest court has not addressed the issue, we follow the decisions of the intermediate appellate courts unless there is a convincing reason to depart from them. *Id.* "[A] state appellate court's decision can provide controlling guidance." *Id.* at 517–18 (citations omitted).

Whether a particular rule is substantive or procedural can be a close question. *Romspen Mortg. Ltd. P'ship v. BGC Holdings LLC – Arlington Place One*, 20 F.4th 359, 369 (7th Cir. 2021). In such "gray areas," we consider whether "the scope of any federal rule or statute is broad enough either to cause a direct collision with the state law or otherwise controls the issue before the court." *Id.* (internal quotation marks omitted). No

conflict is apparent here because *Thomson* adopted the rule in *Taco Bell*. *See Thomson*, 11 N.E.3d at 1023–24.

Burdens of proof in diversity cases are matters of substantive law. *Romspen*, 20 F.4th at 369. The presumption at issue here is akin to a burden of proof because it "determines the outcome in cases where the evidence is in equipoise" and therefore "advances the substantive policies of a state." *James River Ins. Co. v. Kemper Cas. Ins. Co.*, 585 F.3d 382, 385 (7th Cir. 2009). This points to the presumption as more substantive than procedural. So, state law controls, and we apply the *Taco Bell* framework except where the Indiana Court of Appeals explicitly modified it in *Thomson*.

Liberty offers two reasons why it believes the *Thomson* presumption does not apply. In Liberty's view, USAG is not entitled to the presumption because it failed to adequately supervise the outside counsel it engaged, and it did not pay in full the fees it incurred. We address each of these arguments, reviewing legal questions de novo while bearing in mind that our review of the ultimate fee determinations is for abuse of discretion. *Vega*, 12 F.4th at 702; *see also Metavante*, 619 F.3d at 775 (stating that a district court's assessment of whether fees are reasonable and necessary is reviewed for abuse of discretion). When Liberty challenges portions of fees that were adjudicated solely based on factual findings, our review is for clear error. *See, e.g.*, *Wilborn v. Ealey*, 881 F.3d 998, 1004, 1006 (7th Cir. 2018) (findings of fact are reviewed for clear error); *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (findings of fact are to be overturned only when the reviewing court "is left with the definite and firm conviction that a mistake has been committed").

**A**

According to Liberty, USAG did not meaningfully supervise outside counsel because Schneider never requested write-offs from outside counsel and rarely followed up with them to ask questions about invoices they submitted. USAG counters that neither *Thomson* nor any decision of this court has required requests for write-offs or particular questions about bills as requirements for supervision.

Ultimately, Liberty cannot cite precedent to support its position. Liberty relies on *Metavante*, where this court observed that a "prevailing party's general counsel, or similar corporate officer, has a duty, imposed by various provisions of federal and state law, to scrutinize the bills before paying them." 619 F.3d at 775 n.22. But that duty does not require a party to either request write-offs from outside attorneys or ask them questions about invoices.

We hold that a litigant may supervise its outside counsel without refusing to pay portions of legal bills or engaging in hairsplitting about those bills. Nothing in the case law provides otherwise. Liberty's challenge to the courts' determinations that USAG adequately supervised its outside counsel therefore targets factual findings. Those findings are due significant deference. *See Vega*, 12 F.4th at 702; *Wilborn*, 881 F.3d at 1004, 1006. We analyze these aspects of the appeal in Section III.

**B**

Liberty argues next that the *Thomson* presumption does not apply because USAG failed to pay about 30 percent of the fees it incurred. USAG responds that Liberty seeks to invent conditions on the presumption of reasonableness that no

court has ever imposed. USAG further contends that its payment of nearly 70 percent of the fees is sufficient evidence that all the fees are reasonable.

Important to this analysis are *Taco Bell* and *Metavante*, which the Indiana Court of Appeals adopted in *Thomson*. 11 N.E.3d at 1023–24, 1031. The presumption applies when there is "uncertainty about reimbursement" of legal expenses such that there are "market incentives to economize." *Taco Bell*, 388 F.3d at 1075–76; *see also Metavante*, 619 F.3d at 774–75. Neither case mentions a requirement that the party seeking fees must have paid its fees in full. So, under the Seventh Circuit case law that the Indiana Court of Appeals adopted in *Thomson*, payment in full is not a requirement for the presumption of reasonableness to apply.

We take this opportunity to clarify an aspect of the rule in *Taco Bell*. The market-tested presumption applies when, following an insurer's breach of the duty to defend, a policyholder has supervised and *incurred* legal fees without any expectation of payment by the insurer. *See Taco Bell*, 388 F.3d at 1075–77. Payment by the policyholder is not necessarily required. This is because, as here, the policyholder may lack sufficient funds to pay fees that are reasonable and necessary to its defense. But if the policyholder does pay a significant percentage of its fees—particularly when it has difficulty covering its day-to-day operating expenses—that is strong evidence of market incentives to economize, rendering the presumption applicable.

It is undisputed that USAG paid nearly 70 percent of the attorneys' fees for which it now seeks reimbursement. That is compelling evidence of a market test. This element of the *Thomson* presumption supports, rather than contradicts, the

bankruptcy and district courts' conclusions that the fees USAG claimed are presumed to be reasonable and necessary.

### III

Beyond the critiques relating to USAG's supervision of outside counsel and its payment of fees, Liberty also contends that USAG is not entitled to the presumption because of additional "special circumstances." Although that phrase originates in *Metavante*, Liberty offers it here without context. There, we said that "special circumstances may arise in which a district court will have reason to doubt whether market considerations alone were sufficient to ensure reasonable fees. In those instances, the district court, as a matter of its sound discretion, can require additional information of the parties." *Metavante*, 619 F.3d at 775.

Key here, though, is the phrase "as a matter of its sound discretion." With narrow exceptions, a trial court need not require further information from the parties when the court is satisfied that market considerations suffice to ensure reasonable fees. *See id*. Still, we discuss three special circumstances that Liberty believes render the *Thomson* presumption inapplicable.

### A

Liberty notes first that Schneider, USAG's Chief Legal Officer, was an attorney with Miller Johnson, one of the law firms USAG engaged as outside counsel. Because of this conflict, Liberty contends, Schneider "could not provide disinterested and meaningful oversight of Miller Johnson's bills on behalf of USAG." Liberty then asserts that "[j]ust as they did not scrutinize the fees of the other firms representing USAG,"

the nonprofit's executives "did not scrutinize Miller Johnson's fees despite Mr. Schneider's patent conflict of interest."

Despite Liberty's contentions, the governing case law does not hold or suggest that the presumption is inapplicable when there is an apparent conflict of interest. To the contrary, an insurer's objections to a policyholder's selection of defense counsel lose force when the insurer disclaims its duty to defend and turns out to be wrong on the law. "Had [Liberty] mistrusted [USAG's] incentive … to economize on its legal costs," Liberty could have reserved its defense that it had no duty to defend and assumed USAG's defense. *Taco Bell*, 388 F.3d at 1076. In that scenario, Liberty could have "selected and supervised and paid for the lawyers defending [USAG]," and Liberty "could later have sought reimbursement if it proved that it had indeed had no duty to defend." *Id*. Liberty chose not to do so, instead electing to gamble by not defending USAG. *See id*. With the benefit of hindsight, Liberty now identifies a purported conflict of interest. The case law does not reward such a choice, and Liberty cannot use the purported conflict to render the presumption inapplicable.

Even more, Liberty undermines its own argument about the supposed conflict of interest by equating USAG's review of Miller Johnson's invoices with its review of the other firms' bills. Testimony at the bench trial was sufficient to support the bankruptcy court's finding that USAG's internal review of legal bills, which involved at least two executives other than Schneider, was adequate. USAG's CEO reviewed the legal bills that outside counsel submitted to ensure they were appropriate and matched the organization's needs. The Chief Financial Officer also reviewed the bills and approved them for payment. Because Liberty claims USAG's review of Miller

Johnson's bills was equivalent to its review of other legal bills, Liberty effectively concedes that any conflict of interest did not materially impact USAG's review of the bills that Miller Johnson submitted.

In any event, the bankruptcy court was aware of Schneider's dual role. The court concluded USAG's practices were nevertheless sufficient to support the *Thomson* presumption's application, as "[i]nvoices were reviewed at three different levels which included review by the Chief Financial Officer responsible for overseeing and authorizing payment of USAG's expenses." As a fact-specific ruling concerning attorneys' fees, that determination is due significant deference. *See Vega*, 12 F.4th at 702; *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 639, 646 (7th Cir. 2011). There is not an adequate basis to disturb it.

**B**

Liberty also contends that the bankruptcy court violated *Metavante* by applying the presumption despite a special circumstance involving Gibson Dunn & Crutcher LLP, another law firm that USAG hired. Schneider testified that during Gibson Dunn's representation of USAG, the two organizations agreed Gibson Dunn would seek further reimbursement only from USAG's insurers, not USAG. According to Liberty, this means any fees that USAG incurred through Gibson Dunn's representation from then on were not market tested.

Liberty is correct that after this arrangement was made, USAG was no longer entitled to the presumption for fees that Gibson Dunn later charged. From the point at which the deal was reached, USAG knew it would not be responsible for

paying Gibson Dunn's fees, so USAG lacked an adequate incentive to keep those bills low.

But that conclusion does not fully resolve the issue of the reasonableness of the fees that Gibson Dunn charged. Cooper testified that $379,541 of those fees was reasonable and necessary. Moreover, the payment Liberty made to USAG in May 2022 includes the amount Cooper found reasonable for Gibson Dunn's work. Given that Liberty has effectively conceded that $379,541 was reasonable and necessary, whether that amount is entitled to the presumption does not present a live controversy. Only $73,556 of Gibson Dunn's fees is in dispute.[1]

The bankruptcy court received testimonial and documentary evidence about those fees. Based on the record, that court concluded the entire amount USAG claimed for Gibson Dunn's work was reasonable and necessary. That is a factual finding, and Liberty has a "high hurdle" in seeking to overturn it. *Wilborn*, 881 F.3d at 1006. We address this question in greater detail in Section IV.

## C

Liberty's final challenge to applying the *Thomson* presumption involves grants USAG received from the National Gymnastics Foundation ("NGF"), another nonprofit organization. Schneider testified that USAG received $1.6 million in grant money from NGF in May 2020, and as of July 2020 USAG expected to receive another payment of around $800,000 to $900,000. The bankruptcy court later found USAG

---

[1] $453,097, the total amount USAG sought for Gibson Dunn's work, minus $379,541.

had accepted at least $7.73 million in grants from NGF. In Liberty's view, this "pipeline of third-party support removed the incentive for USAG to drive down costs, the basis for the presumption in *Thomson*."

According to USAG, most of the grant funds were used to pay legal bills other than those for which USAG claimed reimbursement in this litigation. The grant funds merely helped USAG to stay afloat and keep providers from halting their services.[2] NGF's grants did not create a surplus that removed USAG's motivation to keep legal expenses down. Though Liberty disagrees, it does not cite evidence to contest this fact. Again, under *Thomson* the question is whether the policyholder has market incentives to economize. 11 N.E.3d at 1023–24, 1031 (citing *Taco Bell*, 388 F.3d at 1075–77). The bankruptcy court found that the grants left USAG's market-based incentives intact. In that court's view, "USAG's acceptance of funds from third parties for the very purpose of paying fees when it had insufficient resources itself" was not a special circumstance that negated the presumption.

We agree with the bankruptcy court. There is no dispute that USAG was bankrupt and lacked money to spare. Liberty has not identified evidence to challenge the factual finding that USAG used the grant money to stay afloat by paying some bills it had incurred. The record does not support, much less require, any finding that USAG stockpiled vast sums of money for legal expenses, which would have removed any need to economize. So, the NGF grants do not preclude application of the *Thomson* presumption.

---

[2] Oral Arg. at 33:30–35:30.

**IV**

Next, we turn to Liberty's arguments for why the bankruptcy and district courts clearly erred in finding the *Thomson* presumption was not rebutted. When the presumption applies, the insurer has the burden of proof to show the attorneys' fees for which the policyholder seeks reimbursement were unreasonable or unnecessary. *See Thomson*, 11 N.E.3d at 1031–32. Courts need not conduct a detailed, line-by-line review of legal invoices. *Metavante*, 619 F.3d at 773–76; *Taco Bell*, 388 F.3d at 1076.

We discuss the deference we owe to the bankruptcy court's findings. Then, we analyze the court's treatment of the parties' opposing experts. Finally, we summarize Liberty's remaining challenges to the reasonableness and necessity of the work that each law firm performed.

**A**

The bankruptcy court's determinations that the fees USAG sought for each law firm's work were reasonable and necessary rest primarily on factual findings. Our review of the factual findings is for clear error. *Wilborn*, 881 F.3d at 1004, 1006. "We will overturn them only if the entire record leaves us with the definite and firm conviction that a mistake has been committed, giving due deference to the [trial] court's better opportunity to see and hear the witnesses." *Id*. at 1006 (internal quotation marks omitted). Because trial courts are better equipped to adjudicate factual matters and fine details than we are, that rationale applies with special force in litigation about attorneys' fees. *Vega*, 12 F.4th at 702.

After considering whether the *Thomson* presumption applied, the bankruptcy court scrutinized the disputed amounts

as to each law firm's work on behalf of USAG. The court's assessment of whether the fees at issue were reasonable and necessary was heavily informed by its evaluation of the parties' expert witnesses—Schoon for USAG, and Cooper for Liberty. We turn to that issue now.

**B**

As the bankruptcy court observed, Schoon and Cooper took "vastly different approaches" in determining whether the fees USAG incurred were reasonable and necessary. Both experts agreed Indiana Rule of Professional Conduct 1.5 supplied the relevant standard.[3] Schoon used a "total value" approach that accounted for various factors, including the nature and complexity of the legal work that outside counsel performed. Cooper, on the other hand, employed a "task-based" approach that focused on the time and labor required for each task and the fee that is customarily charged for it.

The court found Schoon's "total value" approach to be the appropriate one under Indiana law. We agree. In *Thomson*, the Indiana Court of Appeals resolved a highly similar conflict between two parties with differing views about how to measure reasonable and necessary fees. *See* 11 N.E.3d at 1024–26. According to the state appeals court, the approach for which the insured's expert advocated was "more sound and more consistent with Indiana law." *Id*. at 1025. "Rule 1.5 mandates

---

[3] That rule gives eight factors for determining whether fees are reasonable. Some of those factors include the "time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly"; the "fee customarily charged in the locality for similar legal services"; the "amount involved and the results obtained"; and the "experience, reputation, and ability of the lawyer or lawyers performing the services." IND. R. PROF. CONDUCT 1.5.

a multi-factor total value approach. In addition to time spent, the [c]ourt is to consider novelty, difficulty, skill, experience, reputation, and ability." *Id*. A myopic focus on timekeeping and billing practices, *Thomson* explained, conflicts with Rule 1.5. *Id*.

This resolves the issue of the experts' competing methodologies in USAG's favor. Schoon applied the total-value approach required under Rule 1.5 and *Thomson*, while Cooper applied an approach erroneous under Indiana law. So, the bankruptcy and district courts properly applied Indiana law in crediting Schoon's analytical framework rather than Cooper's.

The bankruptcy court also found Schoon more credible than Cooper, as Cooper did not base his conclusions on empirical studies or data. That credibility determination, which also encompasses a witness's demeanor, is a factual finding properly within a trial court's discretion. *See BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 981 F.3d 618, 622 (7th Cir. 2020); *Madden v. U. S. Dep't of Veterans Affs.*, 873 F.3d 971, 973 (7th Cir. 2017). We will not disturb a court's finding that one expert witness in a bench trial is more credible than another unless the finding is clearly erroneous. *Madden*, 873 F.3d at 973–74. USAG is correct that Liberty has not identified a clear error. In a case of "dueling experts," it is "left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony." *Id*. (citation omitted). We lack an adequate basis on which to override the bankruptcy court's determination that Schoon was more credible than Cooper.

## C

Because the total-value approach for which Schoon advocated applies here, it is unnecessary to scrutinize individual line items in the manner Liberty requests. *See Metavante*, 619 F.3d at 774–76; *Taco Bell*, 388 F.3d at 1075–77. But we will still analyze several of Liberty's objections that the bankruptcy and district courts clearly erred in finding that the insurer failed to rebut the presumption of reasonableness. The objections are considered in descending order of the quantities of fees at issue.

### 1) Jenner & Block LLP

USAG retained Jenner & Block LLP as its bankruptcy counsel, and that firm also represented USAG in connection with an investigation conducted by the Indiana Attorney General. For Jenner & Block's work, USAG was awarded $213,234.71, as the bankruptcy court concluded that amount of the firm's fees were reasonable and necessary. Liberty objects to that conclusion.

Cooper's first concern with Jenner & Block's fees was that its invoices contained excessive redactions. The bankruptcy court found that objection was misplaced because "the redactions are almost entirely for costs USAG is not seeking from [Liberty]." On appeal, Liberty fails to explain why the bankruptcy court's finding is incorrect, much less clearly erroneous.

Cooper also objected to work Jenner & Block performed as unnecessary. Jenner & Block worked on clawback requests, seeking to recover for USAG privileged documents that had inadvertently been produced in the Chapter 11 bankruptcy proceeding. Cooper claimed this work was both unnecessary

and duplicative of efforts made by another law firm, Barnes & Thornburg LLP. As the bankruptcy court noted, though, the representation of USAG in the Chapter 11 bankruptcy was novel and complex; the investigations involved "millions of documents." The court was therefore well within its discretion to reject Liberty's arguments that it was inherently unnecessary and duplicative for multiple firms to conduct clawback reviews and seek the return or destruction of privileged documents "to avoid a potentially catastrophic privilege waiver." Liberty has failed to identify a clear error in this respect.

*2) Barnes & Thornburg LLP*

USAG hired Barnes & Thornburg to work on the Indiana Attorney General investigation, among other matters. The bankruptcy court awarded USAG the full amount of fees requested for Barnes & Thornburg's work—$789,049.76. Liberty objects to $82,472.76 of those fees. Along with making criticisms concerning block billing, Liberty also claims Barnes & Thornburg performed tasks that were duplicative of those done by another law firm.

Under the total-value approach required by Indiana law, the bankruptcy court was within its discretion to overrule Liberty's objection to Barnes & Thornburg's fees. As that court noted, it was reasonable and necessary for that firm to familiarize itself with the essential aspects of the allegations made against USAG and the supporting evidence for those allegations. Indeed, had Barnes & Thornburg failed to do so, it could have potentially risked malpractice.

### 3) *Gibson, Dunn & Crutcher LLP*

USAG engaged Gibson Dunn to prepare USAG's then-CEO for Congressional testimony. As noted earlier, Liberty disputes $73,556.01 of the amount USAG was awarded for Gibson Dunn's work. Liberty argues too many lawyers participated in the preparation sessions.

The bankruptcy court rejected that argument. In that court's view, Schoon testified credibly about the intensive nature of Congressional testimony and the need for many lawyers to prepare a witness. Given the record evidence and that credibility determination, we have no basis to disturb the court's finding that all of Gibson Dunn's fees were reasonable and necessary. *See Madden*, 873 F.3d at 973–74.

### 4) *Faegre Baker Daniels LLP*

Faegre Baker Daniels LLP served as USAG's national coordinating counsel on Nassar-related, mass-tort litigation before ultimately withdrawing because of a conflict of interest. Liberty objects to Faegre's bills totaling $48,199.50. Several lawyers at Faegre assisted with preparation for Congressional testimony, and USAG sought reimbursement for work performed before the conflict of interest forced it to withdraw. Because of the conflict, Liberty submits those fees should not be reimbursed.

Considering Schoon's expert testimony, the bankruptcy court was within its discretion to overrule Liberty's objection. Likewise, the court was within its discretion to find reasonable and necessary the fees attributable to work that Faegre performed before its withdrawal. Without the benefit of the hindsight Liberty employs, neither USAG nor Faegre knew

Faegre would later have to withdraw at the time the work was performed.

*5)  Miller Johnson*

Miller Johnson, a Michigan-based law firm, defended USAG in the athlete lawsuits filed in that state. USAG eventually asked Miller Johnson to take over as its national coordinating counsel for all Nassar-related matters. Liberty objects to $35,362.29 of Miller Johnson's fees as purportedly unnecessary and duplicative of other firms' work.

The bankruptcy court, relying on Schoon's testimony, rejected Liberty's argument. Most relevant, in the court's view, was Miller Johnson's role as national coordinating counsel: "USAG has shown that this sort of work is reasonable and necessary, in part based on the testimony of someone who has actually served in that role." Given that Cooper had no experience comparable to serving as a company's national coordinating counsel in this type of nationwide litigation, Schoon's testimony went unrebutted. Liberty has not identified a clearly erroneous factual finding in the bankruptcy court's analysis of the fees USAG claimed for Miller Johnson's work.

*6)  Hilder & Associates, P.C.*

Hilder & Associates is a criminal defense firm that represented USAG in one of the "revocation lawsuits," which were brought by coaches and owners of gyms associated with USAG to recover financial losses allegedly stemming from its handling of Nassar's crimes. Liberty objects to $5,646.99 of fees incurred, contending Hilder spent too many hours on a successful motion to compel arbitration.

The bankruptcy court was not persuaded. It cited Schoon's testimony that "winning the motion undoubtedly saved

USAG a lot of time and money as a loss on that motion would have led to adjudication in a very unfriendly forum." That testimony was uncontradicted. Once again, Liberty fails to identify a clearly erroneous factual finding.

*        *        *

To sum up, the bankruptcy and district courts did not clearly err in concluding Liberty did not rebut the presumption that the fees USAG incurred were reasonable and necessary.[4]

V

In adjudicating this fee dispute, the bankruptcy court concluded that the *Thomson* presumption applied despite Liberty's challenges to the nature of USAG's supervision of outside counsel and the proportion of fees paid by USAG. That ruling adhered to both *Thomson* and the Seventh Circuit authority it adopted. The particular form of supervision for which Liberty advocates is not a prerequisite for the presumption that attorneys' fees are reasonable and necessary, and

---

[4] In its brief, USAG requests sanctions under Federal Rule of Appellate Procedure 38. USAG argues that Liberty used this appeal to delay payment without any basis in controlling law, and that on appeal Liberty has misrepresented legal principles and omitted crucial facts.

Generally, if a party requests monetary sanctions only in its brief, rather than by separate motion, we do not consider the request. FED. R. APP. P. 38 advisory committee's notes to 1994 amendments ("A statement inserted in a party's brief that the party moves for sanctions is not sufficient notice."); *Waldon v. Wal-Mart Stores, Inc., Store No. 1655*, 943 F.3d 818, 824 (7th Cir. 2019); *Matter of Lisse*, 921 F.3d 629, 645 (7th Cir. 2019). USAG did not file a separate motion for sanctions, so we do not consider its request. Although upon proper notice we may award Rule 38 sanctions on our own motion, we decline to do so here.

neither is the policyholder's full payment of all the fees it incurred.

The special circumstances that Liberty identifies also do not categorically preclude the presumption's application. Rather, the bankruptcy and district courts were within their discretion to conclude it applied, subject to limited exceptions. Finally, Liberty failed to rebut the presumption by showing any portion of the fees was not reasonable and necessary.

For all these reasons, we AFFIRM the judgment.